In re WORLDCOM, INC. SECURITIES LITIGATION

This Document Relates to:

*Retirement Systems of Alabama v. J.P. Morgan Chase & Co., et al.,* Case No. CV 2002–1947–P (Circuit Court, Montgomery County, Alabama)

No. 02 Civ.3288(DLC).

United States District Court, S.D. New York.

April 23, 2004.

528

J. Michael Rediker, Thomas T. Gallion, Leo Kayser, III, Thomas L. Krebs, Mi-chael K.K. Choy, J. Vernon Patrick, Page A. Poerschke, Haskell Slaughter Young & Rediker, L.L.C., Birmingham, AL, The Honorable Charles Price, Presiding Circuit Judge for the 15th Judicial Circuit Of Alabama, Montgomery County Circuit Court, Montgomery, Alabama, for Plaintiffs Retirement Systems of Alabama.

Eliot Lauer, Michael Moscato, Curtis, Mallet–Prevost, Colt & Mosle LLP, New York City, for Defendant Arthur Anderson LLP.

Jay B. Kasner, Susan L. Saltzstein, Steven J. Kolleeny, Skadden Arps Slate Meagher & Flom LLP, New York City, for the Underwriter Defendants.

Martin London, Bruce Birenboim, Brad S. Karp, Eric S. Goldstein, Joyce S. Huang, Andrew Ehrlich, Paul Weiss Rifkind Wharton & Garrison LLP, for Defendants Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup Inc., and Jack Grubman.

Troy King, Attorney General, Kevin C. Newsom, Solicitor General, Charles Campbell, Assistant Attorney General, State of Alabama, Office of the Attorney General, Montgomery, AL, for the State of Alabama As Amicus Curiae Supporting the Alabama Plaintiffs.

## OPINION AND ORDER

COTE, District Judge.

Certain defendants in this complex securities litigation arising from the collapse of WorldCom, Inc. ("WorldCom") have moved for a writ to require a trial in a related Alabama state court action to be rescheduled from October of this year to no earlier than sixty days following the completion of the class action trial which is scheduled to begin in this Court on January 10, 2005. This application for extraordinary relief has been made pursuant to the All Writs Act, 28 U.S.C. § 1651. It is

opposed by the plaintiffs ("Alabama Plaintiffs") in the Alabama action ("Alabama Action"), the state court judge presiding over that action, and the State of Alabama. For the following reasons, a writ shall issue.

*Background*

The issues in and the history of this litigation have been described in many previous Opinions.[1] Nonetheless, because the history of the federal WorldCom litigation and the Alabama Action are intertwined, and because that shared background is integral to this decision, an outline of the relevant history is presented here, beginning with the federal litigation.

A. *The Federal Securities Litigation*

On June 25, 2002, WorldCom announced a massive restatement of its financial statements. The first class action lawsuit to anticipate that announcement had been filed in this district on April 30, 2002. Many more followed. The class actions were consolidated through an Order of August 15, 2002, and Lead Plaintiff New York State Common Retirement Fund filed a Consolidated Class Action Complaint (together with its subsequent amendments, the "Complaint") on October 11, 2002. Altogether, approximately thirty-six class actions have been consolidated through the August 15 Order.

The defendants named in the Complaint include former officers and directors of WorldCom, its former auditor Arthur Andersen ("Andersen"), underwriters of WorldCom May 2000 and May 2001 bond offerings, its chief outside analyst Jack B. Grubman, and his employers Salomon Smith Barney, Inc. and Citigroup, Inc. The Complaint asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act ("Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). *See In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d at 398 (largely denying motions to dismiss).

Meanwhile, class actions and scores of individual actions ("Individual Actions") asserting claims against those associated with WorldCom were filed in venues across the country. WorldCom had filed for bankruptcy in August 2002, in fact the largest bankruptcy in United States history. The defendants removed the actions filed in state court to federal court on the ground that they were related to WorldCom's bankruptcy. The Judicial Panel on Multi–District Litigation ("MDL Panel") transferred actions pending in other federal courts to this Court for pretrial purposes. All told, over 100 actions have been transferred by the MDL Panel.[2] Before

---

1. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392 (S.D.N.Y.2003) (deciding motions to dismiss the consolidated class action complaint); *In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y.2003) (certifying the consolidated class action); *In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp.2d 431 (S.D.N.Y.2003) (deciding a motion to dismiss claims in an individual action which had been consolidated for pre-trial purposes with the *Securities Litigation* ).

2. There are currently thirty-nine Individual Actions pending in this Court. Twenty-six Individual Actions have been dismissed as preempted by the Securities Litigation Uniform Standards Act, Pub.L. No. 105–353, 112

Stat. 3227 (1998) ("SLUSA") (codified in scattered sections of Title 15 of the United States Code). *See In re WorldCom, Inc. Sec. Litig.*, 308 F.Supp.2d 236 (S.D.N.Y.2004); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2004 WL 692746 (S.D.N.Y. April 2, 2004); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2004 WL 768566 (S.D.N.Y. April 12, 2004). Plaintiffs in other Individual Actions have moved to dismiss their actions voluntarily because of rulings deciding, for example, that their claims were barred by the statute of limitations. *See, e.g., In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp.2d 431; *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL

such transfers, a handful of actions were remanded to state court.[3] Three of the remanded actions are of significance to this application and are described below.

In December 2002, the consolidated class action and the Individual Actions were consolidated for pretrial purposes because the actions "involve common questions of law and fact" and the consolidation was "necessary to achieve economies for the parties and the Court and to achieve substantial justice for the parties." *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2002 WL 31867720, at *1 (S.D.N.Y. Dec. 23, 2002). These consolidated actions are referred to as the *Securities Litigation.* The reasons for consolidation were further explained in an Opinion of May 22, 2003. Among other things, the consolidation preserves assets for distribution to plaintiffs, provides an opportunity for full and fair discovery for all parties, encourages meaningful participation in settlement discussions, and puts in place a sensible structure for the

management of all of the related Worldcom cases. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21219037 (S.D.N.Y. May 22, 2003). There have been approximately sixteen different groups of attorneys representing plaintiffs in the scores of Individual Actions that have participated in the *Securities Litigation.*

The motions to dismiss the Complaint were largely denied on May 19, 2003.[4] *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392. A class was certified on October 24, 2003, *In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, and the opt out period for the class was set at February 20, 2004.[5]

### Discovery Schedule

With the denial of the motions to dismiss the Complaint, the automatic stay imposed by the Private Securities Litigation Reform Act of 1995 ("PLSRA"), Pub.L. 104–67, 109 Stat. 737 (1995) (codified in part at 15 U.S.C. §§ 77z–1, 78u), was lifted and document discovery began in earnest.[6]

---

22790942 (S.D.N.Y. Nov. 25, 2003); *In re Worldcom, Inc. Sec. Litig.*, 308 F.Supp.2d 214 (S.D.N.Y.2004). In addition, other WorldCom related actions, such as an alleged class action on behalf on plaintiffs who were exclusively "holders" of WorldCom securities (*Weinstein v. Ebbers*, No. 03 Civ. 2841), as well as two consolidated class actions involving financial instruments that tracked the performance of WorldCom securities (*In re Painewebber Goals Sec. Litig.*, No. 03 Civ. 1052 and *In re Targets Sec. Litig.*, No. 03 Civ. 9490), have been consolidated for pretrial purposes in this Court.

3. There are approximately six remanded state actions: *City of Birmingham Retirement and Relief Fund, et al. v. Citigroup Inc., et al.*, No. 03–2373(HLB) (Alabama Circuit Court, Jefferson County); *Tennessee Consolidated Retirement Systems v. Citigroup Inc., et al.*, No. 3:03–0128 (M.D.Tenn.); *Standard Life Investments, Ltd. v. Ebbers, et al.*, No. 04–1938 (D.C.Super.Ct.), and three cases described below.

4. Opinions of June 25 and December 3, 2003 also addressed motions to dismiss the Complaint against Andersen and its affiliates and partners, and claims against the Audit Committee of WorldCom's Board of Directors. *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 23174761 (S.D.N.Y. Dec. 3, 2003).

5. Because of misleading communications by counsel for plaintiffs in certain Individual Actions with clients and class members, in addition to a class notice, a curative notice was sent to all plaintiffs who had filed Individual Actions. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22701241 (S.D.N.Y. Nov. 17, 2003).

6. The Lead Plaintiff in the class action had previously obtained an order lifting the PSLRA stay to obtain documents that WorldCom had provided to government investigators and others. *See In re WorldCom, Inc. Sec. Litig.*, 234 F.Supp.2d 301 (S.D.N.Y.2002).

The defendants were required to substantially complete their document production by October 10, 2003. In the Fall of 2003, the Court and parties discussed the schedule for the remainder of the litigation. An Order of November 14 (the "November 14 Order") set the trial of the class action to begin on January 10, 2005.

Under the November 14 Order, the fact discovery to be taken within the class action and the Individual Actions was to be completed by June 18, 2004. The plaintiffs in the *Securities Litigation* were allocated sixty deposition days, as were the defendants for discovery in the class action. Expert discovery in both the class actions and Individual Actions was to conclude on August 13. Summary judgment motions in the class action were to be made on July 16, and to be fully submitted on August 27. The pretrial order for the class action trial was due November 12. Summary judgment practice in the Individual Actions was to follow the class action trial, as would the trials in those cases. Those Individual Actions which had been filed in districts other than the Southern District of New York would be returned to their home district for trial.

At the request of the parties, the schedule for expert discovery and summary judgment practice was modified in an Order of January 20, 2004. Expert discovery was extended to August 27, and summary judgment motions will be fully submitted on September 10, 2004.

*Motions to Dismiss in Individual Actions*

Pursuant to the defendants' request at a September 12, 2003 conference, an Order of September 22, 2003 scheduled motions to dismiss addressed to issues common to many of the Individual Actions. The first tranche of such motions was decided in Opinions of November 21, 2003, November 25, 2003, and January 20, 2004. *See In re Worldcom, Inc. Sec. Litig.,* 294 F.Supp.2d 431; *In re WorldCom, Inc. Sec. Litig.,* 2003 WL 22790942; *In re Worldcom, Inc. Sec. Litig.,* 308 F.Supp.2d 214 (S.D.N.Y. 2004).[7] The second tranche of such motions was decided in Opinions of February 20 and March 12, 2004. *See In re WorldCom, Inc. Sec. Litig.,* 308 F.Supp.2d 236; *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2004 WL 473366 (S.D.N.Y. Mar.12, 2004).[8]

*Extension of Opt Out Period and Revision of Discovery Schedule in Individual Actions*

On December 16, 2003, this Court certified for interlocutory appeal a denial of remand motions made in certain of the Individual Actions. *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 22953644 (S.D.N.Y. Dec. 16, 2003). In connection with that certified appeal, the United States Court of Appeals for the Second Circuit issued an Order of February 3, 2004 extending the opt out period for the class action to no earlier than thirty days after its mandate issues. The November 14 Order had contemplated that plaintiffs in Individual Actions would respond to initial interrogatories and document requests on the day that the opt out period closed, which had been scheduled for February 20, 2004, that the defendants would complete the discovery they wished to take in those actions by June 18, 2004, and that the expert discovery in the class

---

7. The first tranche of the motions to dismiss addressed the pleading of a Securities Act claim based on bonds issued in a December 2000 private placement, and the statute of limitations for Securities Act claims.

8. The second tranche of the motions to dismiss addressed SLUSA preemption and Securities Act claims brought against holding companies of certain underwriters of WorldCom bond offerings.

action and Individual Actions would occur simultaneously. Given the Second Circuit's extension of the opt out period, the schedule for the Individual Actions has been changed. A Scheduling Order of April 19 (the "April 19 Order") requires those plaintiffs in Individual Actions who wish the fact discovery that is to be taken by the defendants in their actions to close by January 14, 2005, must respond to initial interrogatories and document demands by May 7, 2004. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2004 WL 831018 (S.D.N.Y. April 19, 2004). Those plaintiffs who choose to pursue their Individual Actions, instead of remaining in the class, and who make later productions will have the fact discovery period extended by a corresponding amount of time. The April 19 Order also provides scheduling options for expert discovery in the Individual Actions. As already noted, summary judgment practice and the trials of the Individual Actions will occur after the trial of the consolidated class action.

*Settlement Negotiations*

On November 7, 2002, the Court ordered the parties in the *Securities Litigation* to participate in settlement negotiations under the supervision of the Honorable Michael H. Dolinger, Magistrate Judge of the Southern District of New York. In addition, on September 22, 2003, the Court ordered the parties to engage in further settlement negotiations under the joint supervision of the Honorable Robert W. Sweet, United States District Judge for the Southern District of New York, and Magistrate Judge Dolinger. These two judicial officers and the parties in the *Securities Litigation* have invested a significant amount of time over the intervening months in set-

tlement negotiations. To date, no settlement has been announced.

*Embargo of Government Witnesses*

The defendants in the *Securities Litigation* have brought two motions to extend the fact discovery cut off period. Both motions have been denied. On October 29, 2003, the SSB Defendants [9] presented five separate grounds to justify a stay of discovery. The application was denied in an Opinion of December 16. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22953645 (S.D.N.Y. Dec. 16, 2003).

On February 17, 2004, virtually all of the defendants moved to extend the June 18 fact discovery cut off date and the class action trial by six months. That motion was largely denied at a conference on March 24. One prong of the motion, which anticipated an objection by the United States Attorney's Office for the Southern District of New York (the "Government"), was not ripe for resolution. The Government had objected during the Fall of 2003 to discovery being taken of certain witnesses the Government planned to call at the criminal trial of former WorldCom CFO Scott Sullivan ("Sullivan"). Sullivan eventually pleaded guilty and the Government simultaneously indicted former WorldCom CEO Bernard J. Ebbers ("Ebbers"). The defendants anticipated that the Government would object to discovery being taken of certain witnesses it plans to call at Ebbers' criminal trial, which is scheduled to begin on November 9, 2004. The Government did, in fact, seek to "embargo" thirteen witnesses from discovery until the resolution, either by trial or plea, of the criminal charges it has brought against Ebbers.

**9.** The SSB Defendants include Citigroup Global Markets, Inc. (f/k/a Salomon Smith Barney, Inc.), Citigroup Inc., and Jack Grubman.

An Opinion of April 15, addressed the Government's application and this remaining argument by the defendants for the extension. The Opinion found that an embargo should exist as to at least seven of the identified thirteen witnesses. The Opinion reserved judgment on the proposed embargo on the other six witnesses because the defendants are still in the process of deciding which witnesses they will depose and the full magnitude of the conflict between the defendants and the Government is unknown. The Opinion determined that the defendants would be permitted to save some of their allotted time for deposition discovery to depose embargoed witnesses in the interval between the Ebbers trial and the commencement of the class action trial. The defendants' motion to extend the discovery period and class action trial date was denied. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2004 WL 802414 (S.D.N.Y. April 15, 2004).

## B. *Remanded State Court Actions*

As noted above, a handful of actions have been remanded to state court. On November 10, 2003, the Underwriter Defendants requested that plaintiff's counsel in one of those actions be required to participate in depositions in the *Securities Litigation* in order to avoid duplicative discovery. In response, on November 13, this Court requested the names, telephone numbers, and addresses of the state court judges supervising the remanded actions. As the Court advised counsel on November 26, it called the three state court judges who were presiding over the actions that appeared to be nearing the discovery phase, and was going to send the November 14 Order to each of them.[10] The Court observed that each state court judge would decide what was appropriate for his own case, but that it hoped that everyone would agree to coordinate discovery. The Court enclosed the November 14 Order in a letter sent to each of the three judges on November 26.

The Court asked the Underwriter Defendants to draft a proposed coordination order that would have as its goal the reduction of expense for all parties by avoiding unnecessary duplication of discovery while fully preserving the rights of all litigants. An Order of December 17, required parties in the *Securities Litigation* to submit their responses to the proposal by January 5, to meet and confer, and to submit their proposals to the Court thereafter. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22962509 (S.D.N.Y. Dec. 17, 2003). At a conference of January 22, the Court outlined for the parties the principles it drew from a review of the competing drafts sent to the Court on January 13 and 14. There was general agreement as to those principles from all counsel in the *Securities Litigation*, including the plaintiffs and defendants in the Individual Actions.

Lead counsel for the Alabama Plaintiffs, who had participated in the drafting of the proposals for coordination which were submitted to the Court, attended the January 22 hearing and explained why the Alabama Action had to be tried in 2004 even though that trial date conflicted with the schedule in the *Securities Litigation* and the principles of coordination which all of the parties in the *Securities Litigation* had endorsed.

> Our state has a constitution which is fairly rare.... [The] Constitution of 1901 prohibits the state from running a deficit. As a result, at the end of a fiscal year, September 30[th], all unpaid war-

10. The three state court judges identified to the parties in the November 26 call are identified below in connection with the description of each of their cases.

rants, bills, become unenforceable....In the depression our state passed laws which require the governor, basically, to examine on a quarterly basis and, as necessary, prorate the costs of the government. We are in proration now. We are in a fiscal crisis now. The governor, the new Governor Reilly's package of tax reform and revenue reform did not pass. It was rejected by the voters. *The state is in severe proration.... Our retirement systems* are defined—largely defined benefit plans, to the extent we *have two sources of money to pay the benefits to all our state teachers and all our state employees. One is obviously the income from the portfolio and capital gains. And we've lost almost $300 million in WorldCom. The other, the shortfalls, are made up every year by the state legislature.* Now, when the state is in proration, to the extent they have to meet the shortfall and make up the difference for the pensions, other agencies have an even bigger cut. Alabama judges are extremely aware of it. In Jefferson County, all but I think three of the law clerks have been laid off. The judges are operating without law clerks because we're in proration. That's how bad it is....*It is in the public interest in Alabama for the chance to recoup $300 million of loss not to be delayed. The court down there understands it.*

(Emphasis supplied.) [11]

On January 26, the Court circulated its revision of the most recent draft of the proposed coordination order. All parties in the *Securities Litigation* were given an opportunity to propose changes to that draft, and their proposed changes were incorporated by the Court. A final draft was circulated and no party in the *Securi-* *ties Litigation* made any objections to the final draft. As a result of this lengthy and inclusive process, the Discovery Coordination Order ("Coordination Order") was issued on January 30, and sent promptly thereafter to each of the three state judges identified below. *See In re Worldcom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2004 WL 817355 (S.D.N.Y. Jan. 30, 2004).

The Coordination Order has two parts, an Order issued by this Court and an Order to be signed by any state court judge who wishes to adopt it. The Coordination Order recites the following principles:

1. Discovery and trial in the Individual Actions and the State Court Actions shall not delay or interfere with discovery in and trial of the Class Action. Accordingly, the first trial in the World-Com securities litigation shall be the Class Action trial, which is scheduled to commence on January 10, 2005.

2. The stays of discovery or proceedings imposed by the Court in the Consolidated Actions as to one or more parties shall be effective in the State Court Actions.

3. Discovery in the State Court Actions shall be coordinated so that it is not more expedited that the expert and fact discovery schedule in the Consolidated Actions....

4. The parties in the State Court Actions will use documents, interrogatory responses and responses to requests for admission made or produced in the Consolidated Actions,....

5. Every effort shall be made to depose witnesses common to one or more of the Consolidated Actions and State Court Actions only once....

---

**11.** This rationale has since been shown to be without any basis and, as described below, has been rejected by the judge presiding over the Alabama Action.

6. In the event any party in a State Court Action wishes to participate in settlement discussions that may be taking place in the Consolidated Actions, the parties in the State Court Action may contact the Court in the Consolidated Actions to gain such participation. . . .

There are three remanded actions that have entered the discovery phase. The judges presiding over each of those actions have generally coordinated the discovery in those actions with the discovery in the *Securities Litigation.* In two of the remanded actions, the judges have also scheduled the trial before them to follow the class action trial. In the Alabama Action, however, the Alabama Plaintiffs have urged and the presiding judge has agreed to bring that case to trial in advance of the class action trial in the *Securities Litigation.*

*Illinois Action*

The Honorable Philip J. Kardis presides over *Illinois Municipal Retirement Fund v. Citigroup Inc., et al.,* No. 03 L 772 (Circuit Court, Madison County, Illinois) ("Illinois Action"). On December 11, 2003, Judge Kardis issued an order requiring discovery to be completed by December 15, 2004, and his case to be ready for trial on April 11, 2005. The order included a requirement that there be coordination of depositions with those in the *Securities Litigation.*

*Pennsylvania Action*

The Honorable C. Darnell Jones presides over *Steelworkers Pension Trust v. Citigroup, Inc. et al,* No. 003441 (Court of Common Pleas, Philadelphia County, Pennsylvania) ("Pennsylvania Action"). On October 14, 2003, Judge Jones issued a scheduling order requiring discovery to be completed by August 2, 2004, and the case to be ready for trial by March 7, 2005. Judge Jones sua sponte issued an order on March 11, 2004, requiring counsel before him to show cause why he should not adopt the Coordination Order.

*Alabama Action*

The Honorable Charles Price presides over *Retirement Systems of Alabama, et al. v. J.P. Morgan Chase & Co., et al.,* No. CV 2002–1947(a)–PR (Circuit Court, Montgomery County, Alabama) ("Alabama Action"). The plaintiffs in the Alabama Action are collectively referred to as the Retirement Systems of Alabama ("RSA").[12] The Alabama Action was filed on July 15, 2002, two and a half months after the first class action was filed in this Court. The action was removed to federal court, and on September 24, 2002, remanded to state court.[13]

The complaint was amended on February 3, 2003, and February 20, 2004. It alleges violations of federal and Alabama statutory and common law. The federal claims, based on violations of Sections 11, 12 and 15 of the Securities Act, are also pleaded in the *Securities Litigation.* The defendants include two WorldCom former officers (Ebbers and Sullivan), six investment banks who are also named as defen-

---

**12.** The RSA consists of The Employees' Retirement System of Alabama; The Teachers' Retirement System of Alabama; The Public Education Employees' Health Insurance Fund; The Public Employees' Individual Retirement Account Fund; The Clerks' and Registers' Supernumerary Fund; The Wildlife and Freshwater Fisheries Fund; The Alabama Cultural Resources Preservation Trust Fund; and The Alabama Trust Fund.

**13.** The defendants appealed the remand order. On June 18, 2003, the Court of Appeals for the Eleventh Circuit dismissed the appeal for lack of appellate jurisdiction. On January 12, 2004, the Supreme Court denied the petition for a writ of certiorari.

dants in the *Securities Litigation,*[14] Andersen, and Bear Stearns & Co., Inc. ("Bear Stearns"). Only Bear Stearns is not a defendant in the *Securities Litigation.*

The Alabama Action arises from and pleads the same course of conduct on which the *Securities Litigation* is premised. It seeks damages for one of the two massive bond offerings at issue in the *Securities Litigation*—the May 2001 bond offering—as well as for Intermedia bonds sold in October of 2001 by Bear Stearns. Even the latter category of claims, however, emanates from the same underlying financial fraud within WorldCom that is the basis of the claims in the *Securities Litigation.*

During the spring of 2003, defendants Ebbers and Sullivan sought stays of the Alabama Action. Those stays were denied. In the event that the stays were granted, the other defendants in the Alabama Action also sought stays on the ground that a stay would interfere with their ability to prepare for trial. Ebbers, Sullivan and the defendants sought a writ of mandamus from the Alabama Supreme Court in support of their applications for a stay. On July 11, 2003, the Alabama Supreme Court granted the stays as to Ebbers and Sullivan but denied the request of the remaining defendants for a stay. *See Ex Parte Ebbers,* 871 So.2d 776, 2003 WL 21570770 (Ala. 2003).

On September 25, 2003, the Alabama Plaintiffs signed the confidentiality stipulations that govern the *Securities Litigation.* Thereafter, their counsel was granted access to and reviewed the libraries of documents that have been produced and collected in the *Securities Litigation.* The Alabama Plaintiffs have also participated fully in the depositions taken in the *Securities Litigation.*

The Alabama Plaintiffs have consistently pressed to bring their case to trial in advance of the *Securities Litigation* class action trial. On December 15, 2003, approximately a month after the November 14 Order was issued and the class action trial date set, they petitioned Judge Price for a trial in the summer of 2004. On December 17, before the defendants in the Alabama Action had responded, Judge Price issued an order indicating his intention to try the Alabama Action in 2004.[15] The December 17 order reads in pertinent part

> Judge Denise Cote, of the MDL case, called Judge Price … approximately two weeks ago to discuss coordination of discovery. *This Court agreed with Judge Cote that where it is possible, coordination is preferred and should be implemented.* However, this Court desired to consider all of the effects of the matter and advised Judge Cote that it would get back to her with this Court's final determination…. This Court has taken into account … this Court's past indications to the parties that this case would be scheduled for trial in mid–2004 and its *continuing intentions that this case will be tried in 2004 (which is a different schedule than the MDL case );* … and areas where coordination with the MDL case is workable…. [T]his Court will also advise Judge Cote that it intends to provide for as much coordination of discovery in this case with MDL

---

14. The investment bank defendants who are named in the *Securities Litigation* and the Alabama Action are Bank of America Corporation, J.P. Morgan Chase & Co., Banc of America Securities LLC, J.P. Morgan Securities, Inc., Citigroup Inc., and Citigroup Global

Markets Inc. (f/k/a/ Salomon Smith Barney Inc.).

15. The defendants filed their response to the Alabama Plaintiffs' proposal on December 18.

case discovery as is feasible under the circumstances....

(Emphasis supplied.)

On January 14, 2004, the Alabama Plaintiffs filed an application for a revised scheduling order premised upon "a trial date in September or October of 2004." Again, before the defendants had responded,[16] Judge Price executed the Alabama Plaintiffs' proposed scheduling order on January 20. That order provides a series of dates in advance of those contained in the November 14 Order, including setting the Alabama Action for trial on October 18, 2004. The January 20 order acknowledges that Judge Price had reviewed the November 14 Order, but nonetheless sets the cut off for fact discovery for June 11 (instead of June 18), the completion of expert discovery by June 11 (instead of August 13), the filing of dispositive motions by July 30 (instead of July 16), and the trial on October 18 (in contrast to January 10, 2005).

The defendants moved on February 17 for the adoption of the principles of coordination contained in the Coordination Order. On March 5, the defendants moved in the alternative to modify the scheduling order in the Alabama Action by extending the trial date by nine months in light of its lack of access to certain discovery materials, including its expectation that the Government would oppose its efforts to depose twenty-nine "key WorldCom witnesses." [17]

On March 15, following negotiations with the defendants, the Alabama Plaintiffs submitted a motion for the adoption of a revised scheduling order. The revisions bring essentially all of the dates in the Alabama Action in line with those in the *Securities Litigation* with the exception of the trial date. The Alabama Plaintiffs continued to press for an October 18 trial, a date to which the defendants would not agree.

Judge Price heard argument on the defendants' two motions on March 17. The defendants urged a later trial date and explained that there was no basis in fact for the Alabama Plaintiffs' argument that a budget crisis in Alabama required a 2004 trial date. During that oral argument, the Alabama Plaintiffs presented a new explanation for their need for an early trial date:

[The defendants] want us to participate in a so-called global settlement. You know what happens in global settlements? You get five to ten cents on the dollar. I believe we'll get a hundred cents on the dollar, not counting punitives. And we're under a statute. They don't have a statute in federal cases. We're under a statute here which gives us our attorneys fees on top, and prejudgment interest at 6 percent on top; neither of those are involved in any federal rule or statute....*We don't care about global public interest. We care about the public interest here.:..We have fought from day one to get it to trial.*

(Emphasis supplied.)

At the March 17 hearing, Judge Price made clear that he would not base his decision regarding a trial date on the fiscal condition of the State of Alabama. On March 18, however, Judge Price issued a one page order denying without explana-

---

16. Unaware that Judge Price had already executed the proposed order submitted to him by the Alabama Plaintiffs, the defendants served their opposition to the January 14 application on January 21.

17. This motion is largely duplicative of the motion made by defendants in the *Securities Litigation* on February 14, which was denied by this Court on the record on March 24 and through the Opinion of April 15.

tion the defendants' motion to adopt principles of coordination, at least in "the form set out in their motion," and the defendants' motion to vacate his January 20 scheduling order. As described below, on March 23, the defendants sought and obtained an Order from this Court directing the Alabama Plaintiffs to show cause why a writ should not issue that would stay summary judgment practice and the trial in the Alabama Action until after the conclusion of the class action trial in the *Securities Litigation*.

On April 2, the parties to the Alabama Action again tried to obtain Judge Price's consent to bring the schedule in the Alabama Action more in line with that in the *Securities Litigation*. They submitted a joint motion to adopt a revised scheduling order. In that proposal, the Alabama Plaintiffs agreed that the Alabama Action should track the scheduling dates in the *Securities Litigation*, with the exception of the trial date. The defendants stated that they "strongly" support coordination with the *Securities Litigation* for the reasons that they had already described in their motion urging Judge Price to adopt the principles of coordination. The defendants also asserted that the trial in the Alabama Action should "follow the conclusion" of the trial in the *Securities Litigation*, and that they did not waive their objection to the earlier trial date. In light of Judge Price's determination that the Alabama Action would be tried on October 18, however, the parties agreed to a schedule that would accommodate that decision, a schedule which adopted each of the relevant dates in the scheduling orders governing the *Securities Litigation* except for the trial date.

The parties, however, presented alternative versions of one paragraph concerning further revisions to the dates in the order. The defendants' version provided that any change in the schedule in the *Securities Litigation*, including any order that allowed the parties to take depositions after the cut-off date for depositions, would result in an automatic modification of the deadlines in the Alabama Action. The Alabama Plaintiffs' version provided that a party could request Judge Price to modify his deadlines if the schedule in the *Securities Litigation* was modified.

Later on April 2, the Alabama Plaintiffs made a further application to Judge Price in light of their conversations with the Government about the issue of embargoed witnesses. As a result of those conversations, the Alabama Plaintiffs urged that this Court, and not Judge Price, should resolve any dispute that arose within the Alabama Action regarding embargoed witnesses since the witnesses were not "case-specific" witnesses for the Alabama Action, but were relevant to all WorldCom related actions. The Alabama Plaintiffs proposed that Judge Price issue an order that would require parties in the Alabama Action to resolve any dispute about embargoed witnesses through litigation in the *Securities Litigation*. The proposed order reads in relevant part:

1. The party issuing any notice of intent to *serve any subpeona* . . . with regard to a person who is not a case-specific witness . . . shall forthwith serve a copy of each and every discovery notice . . . *upon* not only the parties to this action but also to the following persons: (1) the Department of Justice . . . ; (2) *lead counsel for the MDL class action; and (3) liaison counsel for plaintiffs in the MDL proceeding.*

2. If and when any objection to a subpoena or discovery notice is filed with this court, or any motion to enforce or quash any subpoena or discovery notice is filed with this Court, which states that a witness from whom documents or

other discovery is sought is an "embargoed" witness, *such discovery shall be deemed stayed,* as regards compulsion under any notice or process emanating from this court or case, *pending a ruling by the MDL court* as to whether such discovery of such embargoed witness shall or may take place, and under what conditions. The effect of this provision is intended to be that *any parting seeking to enforce such subpoena or discovery must apply for such enforcement, or a ruling, from the MDL court, not this court,* as to a ¶ 4(c) witness.

(Emphasis supplied.)

On April 5, the Government wrote to Judge Price and requested that he require all parties to provide the Government with notice of any depositions, and that if the Government objected to a deposition, that the conflict be resolved by this Court in the context of the *Securities Litigation.* On April 14, the Government filed a motion to intervene in the Alabama Action in order to obtain this relief.

At an April 16 hearing, Judge Price adopted the parties' April 2 revised Scheduling Order, endorsing the Alabama Plaintiffs' version as to how Judge Price would deal with future changes to the schedule in the *Securities Litigation.*[18] In addition, and despite the impediment that an embargo of witnesses would appear to present, Judge Price reiterated that the trial in the Alabama Action was scheduled for October 18 and that he had no present intention of moving that date, although he

would do so if a party demonstrated to him that its due process rights required a postponement. With respect to the witnesses the Government sought to embargo, Judge Price indicated that he was inclined to follow this Court's ruling on the matter and prevent discovery of certain witnesses. Judge Price stated that an order containing his rulings on the embargo and related issues would be forthcoming.

On April 20, 2004, Judge Price ordered the parties to give the Government notice of any depositions, and directed them to apply "to the court in the MDL and/or this Court" for enforcement of a deposition notice if the Government objects to any deposition. Following this Court's ruling on April 15, Judge Price granted the Government's request for an embargo as to seven witnesses and reserved decision on the remaining six witnesses "as more particularly described in the MDL April 15, 2004 Order."

## C. Order to Show Cause

On March 23, 2004, an Order To Show Cause was issued on defendants' application under the All Writs Act for a stay of the summary judgment practice and the trial in the Alabama Action for a period of no earlier than sixty days following the conclusion of the consolidated class action trial in this Court.[19] Opposition to this application was to be submitted by March 30. On March 26, counsel for the Alabama Plaintiffs requested an extension of time to oppose this application.[20] The request was

---

18. Although the order is dated March 16, 2004, it was actually signed on April 16, 2004.

19. The defendants also requested that pretrial proceedings in the Alabama Action be enjoined to the extent that they are to occur on an earlier basis than set forth in the November 14 Order, as modified on January 20, and as may subsequently be modified. Following Judge Price's adoption on April 16 of the

parties' jointly proposed scheduling order, there is no longer any distinction, apart from the date of trial, between the pretrial schedules in the Alabama Action and in the consolidated class action.

20. Counsel's request for an extension included a five page brief, a sixteen page declaration, and two exhibits.

granted. On April 7, the Alabama Plaintiffs and Judge Price filed responses to the Order to Show Cause.[21] In addition, the Attorney General for the State of Alabama filed an amicus curiae brief opposing the defendants' application. Oral argument was held on April 13.

*Discussion*

■ Invoking the All Writs Act, the Alabama Defendants [22] seek a stay of certain dispositive events in the Alabama Action which conflict with the schedule for the class action trial in the *Securities Litigation.* Specifically, the Alabama Defendants seek to require that any summary judgment practice and trial in the Alabama Action follow the class action trial in the *Securities Litigation.*

The All Writs Act provides federal courts with the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. Significantly for this application, this broad grant of authority is limited by the Anti–Injunction Act, which bars a federal court from enjoining a proceeding in a state court unless that action is "expressly authorized by Acts of Congress, or where necessary in aid of jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.[23]

■ The original formulation of the Anti–Injunction Act was passed in 1793, at least in part in response to the uncertainty created by the coexistence of two separate legal systems in this country: the retained,

sovereign right of each state to establish its own judicial system, and the creation of lower federal courts through the Judiciary Act of 1789. *Atl. C.L.R. Co. v. Bhd. of Locomotive Eng'rs,* 398 U.S. 281, 285–86, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). Our federal system is premised on the understanding that state court proceedings are normally allowed "to continue unimpaired by intervention of the lower federal courts." *Id.* at 287, 90 S.Ct. 1739. State court decisions are reviewed "through the state appellate courts and ultimately" the Supreme Court. *Id.* Federal district courts generally have "no power whatever" to review state court decisions. *Id.* at 296, 90 S.Ct. 1739.

■ Consistent with these principles, the Anti–Injunction Act works "to prevent needless friction between state and federal courts." *Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co.,* 309 U.S. 4, 9, 60 S.Ct. 215, 84 L.Ed. 537 (1940). Because these principles emanate from our very system of government, the exceptions provided within the Anti–Injunction Act to its prohibition are construed narrowly. Although seemingly broad, the phrase "necessary in aid of jurisdiction" should be understood to imply "something similar to the concept of injunctions to 'protect or effectuate' judgments." *Atlantic,* 398 U.S. at 295, 90 S.Ct. 1739. An injunction is necessary in aid of a court's jurisdiction only if "some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consid-

---

**21.** At the hearing addressing this application, counsel for the Alabama Plaintiffs explained that he had used the extension of time to obtain submissions from the State of Alabama and Judge Price. The Alabama Plaintiffs prepared the submission signed by Judge Price.

**22.** The Alabama Defendants are the six investment banks who are also defendants in the *Securities Litigation* and Andersen.

**23.** The Anti–Injunction Act provides in full: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

eration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Id.*

■ While the Anti–Injunction Act presents significant impediments to enjoining a state court in the context of ordinary litigation, its exception permitting injunctions "where necessary in aid of jurisdiction" is more readily met in the context of *in rem* actions. *Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 641, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977); *Toucey v. New York Life Ins. Co.*, 314 U.S. 118, 135, 62 S.Ct. 139, 86 L.Ed. 100 (1941). In *Kline v. Burke Constr. Co.*, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922), the Supreme Court contrasted the power of a lower federal court to issue a writ affecting state court proceedings in the context of an *in rem* action as compared to an *in personam* action. It noted that, if a federal court is the first to acquire jurisdiction over the subject matter of the case, "it may enjoin the parties from proceeding in a state court of concurrent jurisdiction where the effect of the action would be to defeat or impair the jurisdiction of the federal court." *Id.* at 229, 43 S.Ct. 79. In contrast, where the issue is a question of personal liability, and does not involve the "possession or control of a thing", each court "is free to proceed in its own way and in its own time, without reference to the proceedings in the other court." *Id.* at 230, 43 S.Ct. 79. In those circumstances, an action to enforce liability does not "tend to impair or defeat the jurisdiction of the court." *Id.* As a consequence, "the mere existence of a parallel lawsuit in state court that seeks to adjudicate the same *in personam* cause of action does not itself provide sufficient grounds for an injunction against a state action in favor of pending federal action." *In re Baldwin–United Corp.*, 770 F.2d 328, 336 (2d Cir.1985).

Federal appeals courts have either explicitly or implicitly analogized the jurisdiction of a lower federal court presiding over multi-district litigation transferred to it by the MDL Panel to a court's jurisdiction over a res in an *in rem* action. For example, in *Baldwin–United*, the Second Circuit found that the "need to enjoin conflicting state proceedings arises because *the jurisdiction of a multidistrict court is analogous to that of a court in an in rem action* ... where it is intolerable to have conflicting orders from different courts." *Baldwin–United*, 770 F.2d at 337 (emphasis added).

In *Baldwin–United*, thirty-one states had appealed a preliminary injunction issued during a consolidated multidistrict securities class action. They had been enjoined from commencing any action against any of the defendants in the MDL proceeding. After two years of settlement talks coordinated by the district court, negotiations had proved successful as to eighteen of the twenty-six broker-dealer defendants. The states had objected to the terms of the settlement and at least one of the states had sent the defendants notice of intent to bring suit. Although the Anti–Injunction Act was not controlling since the injunction had been issued before any state court suit was commenced, *id.* at 335, the Court of Appeals relied upon the Act, and the case law construing the Act, in affirming the injunction. The Second Circuit held that, "[i]n effect, unlike the situation in the *Kline v. Burke Construction Co.* line of cases, the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control." *Id.* at 337. The court did find that the issuance of an injunction was, however, a "closer" question as to the eight non-settling defendants. It opined

[g]iven the extensive involvement of the district court in settlement negotiations to date and in the management of this substantial class action, we perceive a major threat to the federal court's ability to manage and resolve the actions against the remaining defendants should the states be free to harass the defendants through state court actions designed to influence the defendants' choices in the federal litigation.

*Id.* at 338. The court concluded that if it appeared that a prompt settlement by these defendants was no longer likely, then the injunction should be lifted since state court actions cannot be enjoined "merely because they are duplicative of actions being heard in federal court." *Id.*

In *United States v. IBT*, 907 F.2d 277 (2d Cir.1990), the Second Circuit relied on *Baldwin–United* when it affirmed an injunction channeling litigation relating to a consent decree into federal court. *Id.* at 281. It described the rationale of *Baldwin–United* as follows: "a district judge can legitimately assert comprehensive control over complex litigation." *Id.*

More recently, in *Newby v. Enron Corp.*, 338 F.3d 467 (5th Cir.2003), the Fifth Circuit affirmed an injunction issued by an MDL court in the preliminary stages of litigation. The injunction stayed discovery in a related state court action and enjoined parties from seeking further state court injunctions without leave of the MDL court.[24] The MDL court was heavily engaged in managing complex securities litigation, had issued a comprehensive scheduling order, and discovery was stayed pursuant to the PSLRA. *Newby*, 338 F.3d at 469. In contrast, discovery

had commenced in related individual actions brought in state court, and the state court had rejected a request by a defendant to coordinate discovery with the MDL action. The state court plaintiffs had also requested a freeze on defendants' assets, an application which the MDL court had already denied. *Id.* at 470. Relying on its earlier decision in *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1332, 1334 (5th Cir.1981), which also affirmed an injunction issued by an MDL court against state court litigation, the *Newby* court rejected appellants' contention that the lower court's injunction had violated the Ani–Injunction Act. It observed that "state courts may be enjoined when necessary to prevent a state court from so interfering with a federal court's consideration of [sic] disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Newby*, 338 F.3d at 474 (citation omitted).

The Second and Fifth Circuits do not stand alone in treating MDL cases as the equivalent of *in rem* actions. The Third Circuit in *In re Diet Drugs*, 282 F.3d 220 (3d Cir.2002), cited *Baldwin–United* with approval for its analogy of complex federal litigation to actions *in rem*. *Diet Drugs*, 282 F.3d at 235 n. 12. The Third Circuit affirmed both a permanent injunction issued by an MDL court that prevented plaintiffs in a related state court action from issuing any notice to opt out of the MDL class action on behalf of unnamed absent class members, and a declaration that a state court order that purported to determine the opt out status of federal

---

**24.** At the time it issued the injunction the federal district court had not yet been formally declared an MDL court, but over seventy cases had already been consolidated before the court, and a motion in support of that

designation was pending before the MDL Panel. *Newby v. Enron Corp.*, No. Civ. H–01–3624, 2002 WL 31989193, at *3 n. 1 (S.D.Tex. Feb. 25, 2002).

class members was "null and void." *Id.* at 228, 233.

The Third Circuit concluded that a state court's action could be enjoined under the Anti–Injunction Act where that action interfered with the federal court's "own path to judgment," even though an injunction could not be issued simply because the state court action threatened to reach judgment first. *Id.* at 234. It observed that

> [c]omplex cases in the later stages— where, for instance, settlement negotiations are underway—embody an enormous amount of time and expenditure of resources.... These cases are especially vulnerable to parallel state actions that may frustrate the district court's efforts to craft a settlement in the multi-district litigation before it.

*Id.* at 236 (citation omitted). *Diet Drugs* took care to note that not all of the cases permitting injunctions against state court actions in the context of complex federal litigation involved an approaching settlement.[25] *Id.* It concluded that "[d]uplicative and competing actions were substantially more likely to frustrate proceedings and disrupt the orderly resolution of this dispute at the time [the injunction] was issued than they would be in ordinary actions in personam." *Id.* at 237.

In *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196 (7th Cir.1996), the Seventh Circuit approved application of the exception for the Anti–Injunction Act that "[o]rdinarily" applies only to *in rem* actions, to MDL litigation. *Id.* at 1202–03. Specifically, it stated that the statute

> does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings, including pre-

trial rulings like discovery orders, as long as the injunctions are narrowly crafted to prevent specific abuses which threaten the court's ability to manage the litigation effectively and responsibly.

*Id.* at 1203. *Winkler* reversed the injunction before it, however, because it lacked a sufficient factual underpinning. *Id.* at 1205. The district court had enjoined parties from discovering the terms of a secret agreement between the defendant and lead counsel for the class, an attorney who subsequently resigned that position. *Id.* at 1198. *See also In re American Honda Motor Co., Inc., Dealerships Relations Litig.*, 315 F.3d 417, 440 (4th Cir.2003) (permitting injunction where a parallel state court action threatened to "frustrate a federal multi-district litigation proceedings and disrupt the orderly resolution of those proceedings"); *Wesch v. Folsom*, 6 F.3d 1465, 1470 (11th Cir.1993) ("lengthy and complicated class action suit is the virtual equivalent of a *res* to be administered").

A limited injunction of the Alabama Action is warranted here to the extent that its schedule interferes with the class action trial in the *Securities Litigation*. The prohibition against enjoining state court actions contained in the Anti–Injunction Act does not prohibit such an injunction since the injunction is "necessary in aid" of this Court's jurisdiction.

First, the *Securities Litigation* is an MDL complex of actions. As such, it belongs to that unique class of litigation which is equivalent to an *in rem* action. Moreover, following an enormous investment of effort, it is at an advanced stage. This is an MDL case which began two years ago, before the Alabama Action, with the filing of the first securities class action

---

**25.** The *Diet Drugs* injunction had been issued by an MDL court that had consolidated over two thousand cases, and after "two years of exhaustive work," conditional class certification, and approval of a preliminary settlement. *Diet Drugs*, 282 F.3d at 236.

in this district. The *Securities Litigation* consolidated for pretrial purposes over one hundred class actions and Individual Actions to litigate the securities claims arising from the financial fraud at WorldCom, a fraud that led to the largest bankruptcy filing in American history. The claims related to the two WorldCom bond offerings alone amount to approximately $17 billion.

The *Securities Litigation* has proceeded apace, with a substantial investment of effort from this Court, the two federal judicial officers overseeing settlement discussions, the Lead Plaintiff for the class action, Liaison Counsel for the Individual Actions, and counsel for each of the defendants, as well as many plaintiffs' counsel in Individual Actions. A great deal of motion practice has been resolved with the filing of numerous Opinions. Several legal issues of first impression have been briefed and addressed. The United States Court of Appeals for the Second Circuit has two appeals from the *Securities Litigation sub judice.* The discovery undertaken by the parties has been massive. The management of discovery, of motion practice, and of the relationships among counsel have required careful, almost daily supervision of the litigation. Fact discovery will close in less than two months, expert discovery will occur over this summer, and the trial of the class action will begin on January 10, 2005. Adherence to this schedule, which will bring the class action to trial as expeditiously as fairness and justice permit, has required an enormous effort over at least eighteen months by one and all engaged in this endeavor. The *Securities Litigation* fits comfortably within the set MDL cases which Courts of Appeals have analogized to *in rem* actions.

Second, the schedule in the Alabama Action will derail the schedule in the *Securities Litigation.* Despite the efforts of this Court and the defendants who face litigation in both the *Securities Litigation* and the Alabama Action, the Alabama Plaintiffs and the state court in Alabama have repeatedly affirmed their commitment to try the Alabama Action before the class action trial. Each of the parties in the *Securities Litigation,* including the many plaintiffs who have filed scores of Individual Actions that are consolidated for pretrial purposes with the class action, agrees that the trial of any Individual Action must follow the class action trial. Two of the three state court judges presiding over remanded actions in which discovery is occurring have agreed. The court in the Alabama Action is alone in rejecting that course. It has denied repeated requests to move its trial date to follow the class action trial and has expressed no intent to do so in the future.

If the Alabama Action proceeds to trial in October, or at any time before the class action trial, it will inevitably delay the beginning of the class action trial far beyond January 10. Because most of the issues in the Alabama Action are identical to issues in the *Securities Litigation,* as a practical matter, a decision on a summary judgment motion or any verdict in the Alabama Action will necessarily engender complicated and time-consuming motion practice in the *Securities Litigation* in order to permit the ramifications, including any collateral estoppel effect, of that litigation to be determined before the class action trial begins. The date for the class action trial in this MDL case will be held hostage to the Alabama Action, and this Court's ability to control the schedule of this complex, multi-district securities litigation will be hamstrung. In a very real sense, the energies of all parties in the *Securities Litigation* since at least August 2002 have been focused on the work that is necessary to bring the class action to trial. Those months of extraordinary effort to

keep to the timetable in the *Securities Litigation* will have to yield to the Alabama court's schedule.

An October trial date in the Alabama Action will have other equally serious collateral consequences which will negatively impact the progress of the *Securities Litigation,* although they are harder to quantify. The energies of the defendants in the *Securities Litigation* who are also defendants in the Alabama Action will necessarily be diverted by the need to prepare for and participate in the Alabama Action's October trial. While the Alabama Plaintiffs disparage these difficulties by pointing out that these defendants are well represented by able counsel and should have the resources to work on two tracks, the realities of litigation dictate that the teams of lawyers who have been actively litigating the *Securities Litigation* before this Court will have to transfer their energies to the Alabama Action if it is to be the first-tried case. For each of those defendants (and indeed for every party in the *Securities Litigation* ), the testimony recorded in the first trial will resonate through every subsequent trial. Those attorneys who have been committed to the development of the issues and evidence through the litigation of the *Securities Litigation* will have no choice but to shift their time and efforts to the Alabama Action.

Third, it is a given that no interference with a state court's scheduling of a case on its docket should be undertaken lightly. This case is not an exception to that rule. Out of a concern for comity, recognizing that state courts have a co-equal role in our federal system in administering justice, respecting the special demands that many state courts face from burdensome dockets and limited resources, and fully appreciating the right of a plaintiff following remand to pursue an individual action

in state court that alleges claims arising out of the WorldCom debacle, this Court has reached out to state court colleagues in a spirit of cooperation and motivated by the hope that the coordination of our respective litigations could benefit all of us and our litigants. The parties in the *Securities Litigation* participated with this Court in crafting principles that should guide the coordination of the *Securities Litigation* and remanded actions. All parties in remanded actions have been invited and encouraged to participate fully in the discovery undertaken in the *Securities Litigation* and in its settlement discussions. Nonetheless, despite all of these efforts, coordination of the trial dates in the Alabama Action and the *Securities Litigation* has proven to be impossible. As a result, an injunction has become necessary if this Court is to preserve its ability to control the scheduling of this MDL class action trial, and its power to move the *Securities Litigation* toward as expeditious a resolution as is feasible.

Similarly, given the consistent rejection of all efforts to move the trial date in the Alabama Action, there is no reasonable basis for postponing the issuance of this injunction in the hope that the writ will prove to be unnecessary. The present discord with the trial schedule places intolerable burdens on the *Securities Litigation* and uncertainty about the outcome of this application places all parties in a state of limbo. With the discovery cut-off dates rapidly approaching, a decision on this application should not be deferred.

While it is essential to consider whether injunctive relief is necessary to prevent the state court from impairing this Court's ability to bring this MDL litigation to judgment, it is also vital to insure that any injunction that is issued is as narrowly drawn as possible in order to prevent needless friction between the state and

federal courts.[26] In this regard, it is worth noting that the injunction that is issued here does not seek to prevent the Alabama Plaintiffs from litigating their causes of action in their chosen forum. It will impact only the timing of the litigation of any summary judgment motion practice and of the trial.

Finally, it is worth observing that the Alabama Plaintiffs have not been able to articulate any valid reason why their action should be tried in 2004, particularly when such a trial date will necessarily disrupt the schedule in the federal litigation.[27] Their first proffered reason—that Alabama's budget crisis requires a 2004 trial—was baseless and explicitly rejected by Judge Price. Their second proffered reason—that a 2004 trial will extort a larger settlement—is not a legitimate reason for a trial date, and particularly not for one that creates such friction between the state and federal courts. As the Alabama Plaintiffs acknowledged when describing their purpose, their desire to obtain a settlement that will benefit them at the expense of all of the other victims of the WorldCom fraud is at odds with the general public good.[28]

In sum, an injunction is necessary to preserve the schedule in the *Securities Litigation* and to keep the federal MDL litigation on its own "path to judgment." Its scope is limited in order to avoid any unwarranted intrusion into state court proceedings.

*Additional Legal Arguments*

In their opposition to the Alabama Defendants' application, the Alabama Plaintiffs, supported by Judge Price and the Alabama Attorney General,[29] argue that no writ could issue under any circumstances because the Alabama Plaintiffs are entitled to invoke the doctrine of sovereign immunity, because this Court lacks subject matter jurisdiction over this controversy, and because of the *Rooker–Feldman* and *Younger* abstention doctrines. These arguments are addressed and rejected in turn.

1. *Sovereign Immunity*

 The Alabama Plaintiffs contend that the doctrine of sovereign immunity and the Eleventh Amendment bar the application of the All Writs Act to any lawsuit they file. The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign

---

26. Those opposing this writ have not objected to the sixty-day interval between the class action trial and the dispositive events in the Alabama Action in the event a writ does issue.

27. While not controlling, it is nonetheless worth noting that the date of the class action trial was set before the trial date for the Alabama Action had been chosen, and that all of the participants in the Alabama Action were well aware of the schedule in the *Securities Litigation* when the trial date in the Alabama Action was finally selected.

28. It is also noteworthy that the leverage that the Alabama Plaintiffs anticipate from their 2004 trial date is derived from the schedule in the federal MDL litigation. It is because the Alabama Action's trial is scheduled to occur just in advance of the class action trial, that the Alabama Plaintiffs anticipate having increased leverage over the defendants. The Alabama Plaintiffs not only took advantage of the discovery in the *Securities Litigation* to bring their case to a trial ready posture, they also seek to use the trial schedule in the *Securities Litigation* to give themselves an extra advantage in settlement negotiations with the defendants.

29. Only the Alabama Attorney General argues that the *Younger* abstention doctrine prohibits an All Writs Act injunction.

State." U.S. Const. amend. XI. The Eleventh Amendment prohibits private individuals from suing nonconsenting states in federal court when the state is the real party in interest, regardless of whether the state is nominally included as a defendant. *Bd. of Trustees v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Edelman v. Jordan*, 415 U.S. 651, 663–67, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Eleventh Amendment immunity extends "not only to a state, but also to entities considered arms of the state." *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 81 (2d Cir.2004) (per curiam) (citation omitted).

■ A "suit" in the context of sovereign immunity has a specific meaning. In *Missouri v. Fiske*, 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145 (1933), the Supreme Court found that "[b]y a suit commenced by an individual against a State, we should understand process sued out by that individual against the State *for the purpose of establishing some claim against it* by the judgment of a Court." *Id.* at 26–27, 54 S.Ct. 18 (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 407–08, 5 L.Ed. 257 (1821)) (emphasis supplied). The doctrine of sovereign immunity is inapplicable when a state acts as a plaintiff or in its representative capacity. *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 619, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *In Re: Charter Oak Assoc.*, 361 F.3d 760, 766–70 (2d Cir.2004); *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1564–65 (Fed.Cir.1997); *Baldwin–United*, 770 F.2d at 341.

The defendants' All Writs Act application does not implicate either Alabama's sovereign immunity generally or that principle as embodied in the Eleventh Amendment. The application does not identify the Alabama Plaintiffs as defendants in a "suit," does not seek any form of relief from the Alabama Plaintiffs, and does not prevent the Alabama Plaintiffs from bringing their claims in state court or ask the Alabama Plaintiffs to defend the merits of the Alabama Action in this Court. This Court's narrow injunction is properly directed at the Alabama Circuit Court and only serves to prevent that court from granting summary judgment or from holding a trial in the Alabama Action in advance of the class action trial.

The sovereign immunity argument that the Alabama Plaintiffs press is similar to one rejected in *Baldwin–United*. The Alabama Plaintiffs seek to distinguish *Baldwin–United* on two grounds. First, they contend that two states of the thirty-one states enjoined in *Baldwin–United* had "submitted" themselves to federal court jurisdiction by petitioning to be added to the service list in the class action and filing an amicus brief, and that the other states "were indubitably acting 'in concert'" with those two states. If these actions by the states were material to the decision in *Baldwin–United*, then the Alabama Plaintiffs have more conclusively submitted themselves to this Court's jurisdiction through their application that this Court decide whether *witnesses in the Alabama Action* should be "embargoed" to accommodate the Government's needs.[30] The *Baldwin–United* court did not, however, rest its analysis of the sovereign immu-

---

**30.** The Alabama Plaintiffs represented to this Court at an April 13 conference that they had asked Judge Price to allow this Court to address the issue of defendants' access to witnesses that the Government had sought to embargo. They made that application in writing to Judge Price on April 2. Judge Price has recently granted that application. In addition, on January 22, the Alabama Plaintiffs addressed this Court regarding a proposed order to coordinate the schedules between the *Securities Litigation* and the Alabama Action.

nity argument on a conclusion that two states had submitted to federal court jurisdiction and that the remaining states were acting in concert with them. It concluded that the Eleventh Amendment did not bar the All Writs Act injunction because it did not seek to enjoin any of the states from bringing suits in either a criminal or regulatory capacity, and only affected their ability in a representative capacity to assert personal claims for their citizens. *Baldwin–United,* 770 F.2d at 341. Indeed, the *Baldwin–United* ruling had a far greater impact on the states governed by that injunction than any impact that this writ will have on the Alabama Plaintiffs. The permanent injunction in *Baldwin–United* prevented thirty-one states from filing lawsuits altogether.

Second, the Alabama Plaintiffs contend that they are not bringing suit in a representative capacity, but are instead suing to recover their own losses. The Alabama Supreme Court has already foreclosed that argument. In *Knutson v. Bronner,* 721 So.2d 678 (Ala.1998) (per curiam), the RSA argued and the Supreme Court of Alabama agreed that the RSA is a "public corporation with a fiduciary duty to hold and invest its assets *in trust for its members.*" *Id.* at 681 (emphasis in original). *Knutson* concluded that the assets of the RSA are not state funds because the funds come not just from the state, but from many sources, and "because the constitution provides that these funds are to be held, invested, and disbursed solely for the benefit of the members of the RSA." *Id.* Although the Alabama Plaintiffs seek to distinguish *Knutson* on the ground that it was resolving an issue of taxpayer standing, the analysis in *Knutson* was not limited by that specific context. As *Knutson* itself explained, it had to decide whether the "funds of the RSA are 'state funds.'" *Id.* at 678. *See also McBurney v. Ruth,* 527 So.2d 1265, 1268 (Ala.1988) (holding

that a "public corporation", in that case a Commission created to provide information about the TVA, "is an entity separate from the state and its acts are not 'acts of the state'" within the meaning of the state constitution's prohibition against the "state" creating new debts); *Thomas v. Alabama Mun. Elec. Auth.,* 432 So.2d 470, 480–81 (Ala.1983) (finding that the Alabama constitution protects only "immediate and strictly governmental agencies of the State" from suit, and that "public corporations" are "separate and apart from the State").

### 2. *Subject Matter Jurisdiction*

██ The Alabama Plaintiffs contend that this Court has no subject matter jurisdiction over them or the Alabama Action, and that the All Writs Act cannot provide an independent basis for jurisdiction. The Alabama Plaintiffs correctly point out that the All Writs Act does not "confer original jurisdiction" on federal courts. *See Syngenta Crop Protection, Inc. v. Henson,* 537 U.S. 28, 33, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002).

██ When a federal court has jurisdiction over an action, "the All–Writs Act grants it ancillary jurisdiction to issue writs 'necessary or appropriate in aid of' that jurisdiction." *Baldwin–United,* 770 F.2d at 335. *See also Covanta Onondaga Ltd. v. Onondaga County Resource Recovery Agency,* 318 F.3d 392, 396 (2d Cir. 2003). That includes the power to issue writs affecting third parties.

The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not tak-

en any affirmative action to hinder justice.

*United States v. New York Tel. Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (citation omitted). *See also Sprint Spectrum L.P. v. Mills,* 283 F.3d 404, 413–14 (2d Cir.2002); *United States v. Int'l Broth. of Teamsters,* 266 F.3d 45, 49–50 (2d Cir.2001).

This Court has subject matter jurisdiction over the *Securities Litigation.* For the reasons already explained, it has authority under the All Writs Act to enjoin the Alabama Circuit Court from deciding a summary judgment motion or holding a trial in the Alabama Action prior to the trial of the class action.[31]

### 3. *The Rooker–Feldman Doctrine*

The Alabama Plaintiffs contend that the Alabama Defendants' sole recourse is a direct appeal of Judge Price's rulings since the *Rooker–Feldman* doctrine prevents a lower federal court from sitting in review of a state court's decisions. The *Rooker–Feldman* doctrine is a "judicially-crafted limitation on federal judicial power." *Hachamovitch v. DeBuono,* 159 F.3d 687, 696 (2d Cir.1998). It is a challenge addressed to the existence of subject matter jurisdiction. *Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir.2002). The *Rooker–Feldman* doctrine provides that, "because only the United States Supreme Court may *review* a final decision of a state court, federal district courts do not have jurisdiction over *claims that have already been decided,* or that are inextricably intertwined with issues that have already been decided, by a state court."

*Bridgewater Operating Corp. v. Feldstein,* 346 F.3d 27, 29 (2d Cir.2003) (citation omitted) (emphasis supplied). The *Rooker–Feldman* doctrine is "at a minimum ... coextensive with preclusion principles." *Doctor's Associates, Inc. v. Distajo,* 107 F.3d 126, 137 (2d Cir.1997) (citation omitted). It may also, however, deprive a federal court of subject matter jurisdiction in the context of certain interlocutory orders issued by a state court. *Id.* at 138. Whether the doctrine extends beyond the rules of preclusion "is a question that has perplexed courts and commentators." *Hachamovitch,* 159 F.3d at 696. *See also Phifer,* 289 F.3d at 56. Because of this uncertainty, and because courts should be wary of any "categorical diminution (via court-constructed doctrines) of the power granted to the federal courts by Congress," *Hachamovitch,* 159 F.3d at 696, the *Rooker–Feldman* doctrine "may be a dubious ground for a refusal to exercise federal jurisdiction over a case ... that falls within the statutory grant of subject matter jurisdiction." *Id.* Whatever its precise contours, the *Rooker–Feldman* doctrine does not "work to defeat a district court's authority over the management of its own case." *Diet Drugs,* 282 F.3d at 241.

The *Rooker–Feldman* doctrine does not bar the issuance of this writ. There is no question that this Court has subject matter jurisdiction to preside over the *Securities Litigation.* The writ is authorized by federal statute and necessary to the effective management of this federal action, and this Court's ability to bring the proceedings toward the entry of judgment. The trial date for the class action trial was set through the November 14 Order. The

**31.** The Alabama Plaintiffs argue that this Court is without authority to remove the Alabama Action to federal court, that they opted out of the consolidated class action, and that SLUSA entitles state pension funds to bring securities law claims in state court. The injunction being issued here does not seek to remove the Alabama Action or to prevent the Alabama Plaintiffs from pursing their action in state court. As a consequence, these three contentions miss the mark.

writ seeks to preserve that trial date and is narrowly tailored to achieve that goal. The writ does not seek to review any final decision or judgment entered by a state court. A failure to act would implicitly cede management of this Court's docket to a state court. Nothing in the *Rooker–Feldman* doctrine suggests that that is either desirable or necessary.

### 4. *The Younger Abstention Doctrine*

 The Alabama Attorney General contends that the *Younger* abstention doctrine bars this writ because the Alabama Plaintiffs are carrying out the state's "domestic policies" by invoking the state's securities laws and common law in their lawsuit. In *Younger v. Harris,* 401 U.S. 37, 53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court stated that federal courts should generally refrain from enjoining or otherwise interfering in ongoing state criminal proceedings. *Younger* involved a First Amendment challenge to a pending state prosecution. The *Younger* doctrine applies as well to state administrative proceedings "in which important state interests are vindicated." *Spargo v. New York State Comm'n on Judicial Conduct,* 351 F.3d 65, 75 (2d Cir.2003) (citation omitted). *See also Diamond "D" Constr. Corp. v. McGowan,* 282 F.3d 191, 198 (2d Cir.2002). *Younger* abstention is mandatory when: "(1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Spargo,* 351 F.3d at 75.

This writ does not implicate the *Younger* abstention doctrine. As the Alabama Attorney General concedes, the Alabama Action is not a civil enforcement action. The fact that Alabama's securities laws and its common law provide the basis for some of the causes of action pleaded in the Alabama Action complaint does not convert that civil lawsuit into a regulatory or administrative proceeding.

### *Conclusion*

The defendants' application pursuant to the All Writs Act is granted. The Circuit Court of Alabama is enjoined from resolving any summary judgment motion or beginning the trial in *Retirement Systems of Alabama v. J.P. Morgan Chase & Co., et al.,* Case No. CV 2002–1947–P (Circuit Court, Montgomery County, Alabama), until at least sixty days following the entry of a verdict in the class action trial in the *Securities Litigation.* This writ shall be automatically vacated in the event that the class action trial in the *Securities Litigation* is adjourned without date.

SO ORDERED.

### *INJUNCTION*

For the reasons stated in the Opinion and Order issued today and pursuant to the All Writs Act, 28 U.S.C. § 1651, the Circuit Court of Alabama is enjoined from resolving any summary judgment motion or beginning the trial in *Retirement Systems of Alabama v. J.P. Morgan Chase & Co., et al.,* Case No. CV 2002–1947–P (Circuit Court, Montgomery County, Alabama), until at least sixty days following the entry of a verdict in the class action trial in the *Securities Litigation.* This writ shall be automatically vacated in the event that the class action trial in the *Securities Litigation* is adjourned without date.

SO ORDERED.